UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

THE GRAY INSURANCE COMPANY, CASE NO.

Plaintiff,

v.

NF HOLDING ASC, LLC,

Defendant.
_____________________________________________/

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, The Gray Insurance Company ("Gray"), through counsel, and pursuant to, *inter alia*, 28 U.S.C. § 2201, *et seq.*, files this Complaint for Declaratory Judgment against Defendants, NF Holding ASC, LLC ("NFH"), seeking declaratory judgment that Gray has no liability to NFH under the performance bond that Gray issued on the grounds that NFH is not entitled to any benefits or recovery under the conditions of the performance bond issued by Gray, and breached the performance bond that Gray issued naming NFH as Owner and the Subcontract bonded by Gray, discharging Gray from any obligation under the Bond. In support, Gray alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. This is an action for declaratory relief in accordance with 28 U.S.C. § 2201(a).

2. Gray is a Louisiana corporation that maintains its principal place of business in Metairie, Louisiana, making it a citizen of Louisiana pursuant to 28 U.S.C. § 1332(c)(1).

3. NFH is a Delaware limited liability company with its principal place of business in Chipley, Florida. Based on publicly available information on Sunbiz, NFH's certificate of authority was revoked on September 25, 2026. On information and belief, its sole member is Michael Kozar, a resident and domiciliary of Chipley, Florida, making NFH a citizen of Florida.

4. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and because complete diversity exists between Gray and NFH as citizens of different states. This Court also or alternatively has jurisdiction over this action pursuant to 28 U.S.C. § 2201 because an actual and justiciable controversy exists between Gray and NFH.

5. Jurisdiction and venue are proper in this Court because NFH's member is domiciled in and the Project at issue in this litigation is located in Chipley, Florida,

which is within the boundaries of the Northern District of Florida and within the province of the Panama City Division of this Court.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

I. The Project, Construction Contract, and Bond

6. NFH entered into a Contract with Gateway Property Solutions, Ltd. ("Gateway") dated May 2, 2023 in the amount of $7,590,450.00 (the "Original Contract") for the construction of a Project designed by a design professional retained by NFH referred to as NFCH Surgical Addition (the "Project"). The Original Contract is attached as **Exhibit "A."**

7. NFH and Gateway entered into a separate contract for the Project also dated May 2, 2023, in the amount of $4,949,580.00 ("Revised Contract"). The Revised Contract is attached as **Exhibit "B."**

8. The Revised Contract excluded "All material and equipment (to be owner supplied), Any architectural and engineering documents and fees, FFE, Owner supplied items listed in the drawings, Rooms: SC40, SC41, SC42, CO7, Unforeseen Existing Conditions."

9. In connection with the Revised Contract, Gray issued an industry-standard AIA Document A312-2010 Performance Bond, bearing Bond # GSA 8301085 and dated December 20, 2023, naming Gateway as Contractor and NFH as

Owner (the "Bond") in the penal sum of $4,949,580.00 (the "Penal Sum"). A copy of the Bond is attached as **Exhibit "C."**

10. The Bond provides, in pertinent part:

> § 2 If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except when applicable to participate in a conference as provided in Section 3.
>
> § 3 If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after
>
> .1 the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;
>
> .2 the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and
>
> .3 the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

* * *

§ 5 When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

§ 5.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

.2 Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

11. Thus, the Bond provides, among other things, that so long as there is no Owner Default[1] under the Contract, and if Gateway is in default under the Contract, Gray's obligations under the Bond shall arise only after:

---

[1] Unless otherwise specified herein, capitalized terms have the meaning given to them in the Bond.

a. NFH first provides notice to Gateway and Gray that it is considering declaring a Contractor Default;

b. NFH declares a Contractor Default, terminates the Construction Contract, and notifies Gray; and

c. NFH agrees to pay the Balance of the Contract Price in accordance with the Construction Contract to Gray, or to a contractor selected to perform the Construction Contract.

Bond, §§ 3.1-.3.3.

12. If and when NFH satisfies the requirements of Section 3 of the Bond, Gray has the right to select one of four delineated options under Section 5 of the Bond. Bond, § 5.

13. Section 6 of the Bond expressly provides that Gray "shall be deemed to be in default" of the Bond only if it fails to proceed as provided in Section 5 of the Bond "with reasonable promptness," and then only after NFH sends an additional written notice to Gray "demanding that [Gray] perform its obligations under th[e] Bond . . . ."

14. Only if NFH is not in default under the Contract and only after NFH has complied with the conditions of Sections 3, 5 and 6 of the Bond, and Gray fails to timely respond to the Section 6 notice, can NFH exercise any right under the Bond.

15. Gray's liability, if any, to NFH is further limited to the Penal Sum of the Bond.

16. After Gray issued the Bond, NFH and Gateway entered into an Amendment to Contract dated January 1, 2025. A copy of the Amendment is attached as **Exhibit "D."**

II. NFH's defaults under the Revised Contract

17. During the Project, NFH failed to make timely payments to Gateway in breach of the Contract.

18. The Specifications for the Project expressly provide for the timing of payments to Gateway as follows:

> 1.02 APPLICATIONS FOR PAYMENT: Applications for Payment shall be submitted by the 25th of the month and will be paid by the 10th of the following month. Applications for Payment not received by the 25th of the month will be paid not later than 15 days after the date received. The period covered by each Application for Payment is one month. A retainage of 10% of the amount earned and stored will be withheld from each payment.

A copy of the Specifications is attached as **Exhibit "E."**

19. NFH did not make payments within the time period set forth in the Contract. Untimely payments ranged from 40 days to 182 days after the applicable payment application date.

20. One of the conditions of the Bond is that there be "no Owner Default." "Owner Default" is defined as "[f]ailure of the Owner, which has not been remedied

or waived, to perform and complete or comply with the other material terms of the Construction Contract."

21. Owner failed to comply with the payment terms of the Contract and, therefore, there was an Owner default.

22. Additionally, NFH provided the design (plans and specifications) for the Project.

23. NFH entered into a Standard Form Agreement Between Owner and Architect dated December 16, 2021 ("Architect Contract") with Clemmons, Rutherford & Associates, Inc. ("Architect") for the design of the Project and the provision of construction phase services including Contract administration services for the Project, including evaluations of the work, certification of payment applications, review of submittals, and preparation of change orders and directives. The Architect Contract is attached as **Exhibit "F."**

24. During construction, Gateway encountered a number of design errors, omissions and changes that impacted the cost and progress of the Project including, without limitation:

a. Failure of the original fireproofing design to meet Code (acknowledged by the designer in changing the fire resistance rating in response to RFI 46). The Architect's fireproofing design error caused a cascade of issues that have impacted the Project since February of 2025, when

the initial RFI was submitted. For example, the fireproofing design change pushed out the exterior wall which will necessitate a design change. The exterior wall is a structural component necessary to dry-in the building and perform successor activities, including completion of the roof. NFH and Architect failed to provide Gateway with a revised design, precluding dry-in of the building.

b. Failure of NFH (and/or its design professionals) to account for existing underground utilities in the design resulting in relocation of water, sewer and gas lines and a transformer.

c. Delays in NFH selecting an HVAC system (an owner direct purchase item under the Revised Contract).

d. Failure to approve and/or timely approve change order requests including, without limitation, failing to approve and/or timely approve change orders related to the fireproofing design error and utility relocation issues caused by the errors and/or omissions of the design and/or failure to account for existing utilities in the design.

25. Gateway and Gray are not responsible for design errors or delays caused by design issues.

26. NFH defaulted on the Contract and committed an Owner Default under the Bond by failing to provide a constructable design and/or failing to timely address (or in cases address at all) design errors, omissions and conflicts.

27. Further, NFH's default of its payment, design and construction management responsibilities delayed completion of the Project and Gateway was entitled to time extensions on the Project. NFH further defaulted on the Contract and committed an Owner Default under the Bond by failing to recognize Gateway's entitlement to time extensions and change orders for additional funds in connection with the Project.

III. NFH's Purported Claim Against the Bond

28. In or around April of 2024, NFH notified Gray of alleged issues with the Project. However, NFH did not comply with the conditions of the Bond or make a Bond claim, and Gateway continued working on the Project.

29. By letter dated May 6, 2025, NFH requested a meeting pursuant to Section 3.1 of the Bond.

30. Gray, NFH and Gateway thereafter held a meeting pursuant to Section 3.1 of the Bond.

31. NFH did not terminate Gateway at that time and Gateway continued to work on the Project.

32. By letter dated April 8, 2026, NFH provided Gateway with Notice of Termination for Cause with a copy to Gray. The April 8, 2026, letter failed to comply with Section 3.3 of the Bond.

33. NFH barred Gateway from working on the Project after termination and assumed responsibility for protecting the work in place.

34. By letter dated April 10, 2026, Gray, under a reservation of rights and defenses, requested information from NFH regarding its claims.

35. By letter dated April 27, 2026, Gray questioned the alleged grounds for termination and advised NFH that NFH had failed to comply with Section 3.3 of the Bond. Gray further advised that NFH had not provided a majority of the information requested in Gray's April 10 letter and reserved all rights.

36. When NFH did not respond to Gray's April 27, 2026, letter, Gray sent a letter dated June 3, 2026, again advising that NFH had not complied with the conditions of the Bond and that Gray would be closing its file on June 15, 2026. Gray further detailed NFH's defaults by failing to make timely payments to Gateway, design errors and omissions, and other claims and defenses.

37. By letter dated June 15, 2026, NFH finally responded to Gray. The June 15, 2026, letter still did not comply with Section 3.3 of the Bond, and NFH did not provide all of the information requested by Gray including critical Project accounting and funding information.

38. By letter dated June 23, 2026, Gray responded to NFH's June 15, 2026, letter, advised that key information requests remained outstanding, and advised that NFH still had not complied with Sections 3.3, 5 and 6 of the Bond.

39. By email dated June 24, 2026, NFH inquired as to Gray's position on design errors and omissions, to which Gray responded on June 30, 2026.

40. Gray then did not receive any communications from NFH until October 9, 2026, wherein NFH stated "As you have noted in your prior correspondence, Section 3.3 of the Performance Bond obligates the Owner to agree to pay the contract balance in accordance with the terms outlined in the Contract. The Owner acknowledges its obligations and wishes to explicitly affirm its intention to comply with this requirement."

41. The October 9, 2026, letter included a report that alleged corrosion of building components and construction deficiencies, and claiming that the building needed to be substantially demolished and rebuilt at a cost of $10,705,066.57, more than twice the amount of the Revised Contract bonded by Gray.

42. Many of the alleged construction deficiencies, if they exist, would have been open and obvious during construction and Architect's project administration, including evaluations of the work under the Architect Contract. Nonetheless, many of those items were included in payment applications funded by NFH without reservation.

43. By letter dated October 14, 2026, Gray, among other things, advised NFH that the language in its October 9, 2026 letter did not comply with the Bond and requested proof of funding for the Project given the extreme passage of time from NFH advising Gray of alleged issues and the October 9, 2026, letter.

44. By letter dated October 30, 2026, NFH stated that it agreed to pay the Contract balance in accordance with the terms of the Contract but did not provide any proof of funding.

45. Gray has no liability to NFH under the Bond because:

a. Gateway was not in default under the Contract.

b. NFH committed an Owner Default.

c. To the extent that NFH does not have funding for the full Contract balance, NFH has failed to comply with Section 3.3 of the Bond.

d. NFH failed to protect the work following the improper termination of Gateway.

e. To the extent that NFH issued payment for patently defective or nonconforming work or work not performed, Gray is discharged to the extent of the improper payment.

f. NFH had a duty to Gray to make reasonable and prompt inspections of the principal's work. To the extent that NFH's allegations of defective work are proven, Gray is discharged by NFH's breach of that duty.

g. NFH's design and project administration errors and omissions and resultant delay and cost impact to Gateway were a material modification or cardinal change to the risk, discharging Gray.

h. Gray is not liable to NFH for damages caused by NFH's design and project administration errors and omissions, or for delays caused by NFH or its agents.

46. Gray has retained the undersigned attorneys to represent it in this action and has agreed to pay the reasonable attorneys' fees for the services rendered.

47. All conditions precedent to bringing this action have been performed or, in the alternative, have occurred or been waived.

## COUNT I – DECLARATORY JUDGMENT

48. Gray incorporates the allegations of paragraphs 1 through 47 above as if fully set forth herein.

49. A bona fide dispute and adverse interest exists between Gray and NFH concerning Gray's powers, privileges, rights, and/or obligations under the Bond insofar as Gray believes it is discharged of all Bond obligations and has no liability to NFH. NFH, on the other hand, believes the Bond is still valid and that Gray is liable to NFH under the Bond.

50. Gray seeks certainty as to the existence or non-existence of its obligations and liability under the Bond. Accordingly, Gray has an actual, present, and practical need to have any doubt on this issue resolved and removed.

51. The declaration Gray seeks relates to whether it is liable to NFH under the Bond.

52. Thus, there is a case of actual controversy within the jurisdiction of this Court and declaratory judgment in favor of Gray is proper.

53. Gray is entitled to its attorneys' fees and costs incurred in bringing this action pursuant to pursuant to applicable law, the terms of the Subcontract, the Bond and Section 57.105(7), Florida Statutes.

WHEREFORE, Gray respectfully requests that this Honorable Court grant it the following relief:

a. Enter a declaratory judgment in Gray's favor and against NFH declaring that: (a) Gray has been and is discharged of its obligations under the Bond; (b) Gray has no further obligation, liability, or duty of any kind to NFH; and (c) Gray has no liability for any cost, expense, fee, or damage to NFH as a result of having issued the Bond;

b. Award Gray its attorneys' fees and costs incurred in connection with this action; and

c. Grant and award Gray all other and further relief as this Honorable Court deems just, equitable, and proper.

PASKERT DIVERS THOMPSON

*/s/ Alberta L. Adams*
ALBERTA L. ADAMS
Florida Bar No. 80063
Email: aadams@pdtlegal.com
100 North Tampa Street, Suite 3700
Tampa, Florida 33602
(813) 229-3500 – Telephone
(813) 229-3502 – Facsimile
*Attorney for The Gray Insurance Company*